UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 AUG 16  PM 2: 46

CLERK

BY_____
DEPUTY CLERK

A.H., by and through her parents and natural )
guardians, James Hester and Darlene Hester; )
JAMES HESTER, individually; DARLENE HESTER, )
individually; E.R., by and through her parents and )
natural guardians, Chad Ross and Angela Ross; )
CHAD ROSS, individually; ANGELA ROSS, )
individually; A.F., by and through her parents and )
natural guardians, Daniel Foley and Juliane Foley; )
DANIEL FOLEY, individually; JULIANE FOLEY, )
individually; C.R., by and through her parents and )
natural guardians, Gilles Rainville and Elke Rainville; )
GILLES RAINVILLE, individually; ELKE )
RAINVILLE, individually; and the ROMAN )
CATHOLIC DIOCESE OF BURLINGTON, )
VERMONT, )
)
Plaintiffs, )
)
v. )                    Case No. 2:20-cv-151
)
DANIEL M. FRENCH, in his official capacity )
as Secretary of the Vermont Agency of Education; )
MICHAEL CLARK, in his official capacity as Grand )
Isle Supervisory Union Superintendent; the SOUTH )
HERO BOARD OF SCHOOL DIRECTORS; the )
CHAMPLAIN ISLANDS UNIFIED UNION )
SCHOOL DISTRICT BOARD OF SCHOOL )
DIRECTORS; JAMES TAGER, in his official )
Capacity as Franklin West Supervisory Union )
Superintendent; and the GEORGIA BOARD OF )
SCHOOL DIRECTORS, )
)
Defendants. )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANT FRENCH'S**
**MOTION TO DISMISS**
(Doc. 23)

Minor plaintiff A.H., her parents James and Darlene Hester, minor plaintiff E.R., her parents Chad and Angela Ross, minor plaintiff A.F., her parents Daniel and Juliane Foley, minor plaintiff C.R., her parents Gilles and Elke Rainville, and the Roman Catholic Diocese of Burlington, Vermont (the "Diocese of Burlington") (collectively, "Plaintiffs") bring this action against Defendants Daniel M. French ("Defendant French") in his official capacity as Secretary of the Vermont Agency of Education ("AOE"), Michael Clark in his official capacity as Superintendent of the Grand Isle Supervisory Union School District ("GISUSD"), the South Hero Board of School Directors, the Champlain Islands Unified Union School District ("CIUUSD") Board of Directors, James Tager in his official capacity as Franklin West Supervisory Union Superintendent, and the Georgia Board of School Directors (collectively, the "School Defendants").

In their First Amended Verified Complaint ("FAC"), Plaintiffs allege three claims: a violation of Plaintiffs' Free Exercise of Religion rights by all Plaintiffs against all Defendants (Count I); a claim by the Diocese of Burlington that Defendants violated its First Amendment right to Freedom of Expression (Count II); and a claim by all Plaintiffs against all Defendants for violation of Plaintiffs' constitutional right to Equal Protection (Count III). Plaintiffs seek declaratory and injunctive relief, as well as an award of compensatory damages, attorney's fees, and costs.

On November 27, 2020, Defendant French moved to dismiss the claims against him pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing. Plaintiffs opposed the motion on December 28, 2020, and Defendant French replied on January 11, 2021, at which time the court took the pending motion under advisement.

Plaintiffs are represented by David A. Cortman, Esq., Paul D. Schmitt, Esq., Ryan J. Tucker, Esq., and Thomas E. McCormick, Esq.; Defendant French is represented by Assistant Attorneys General Jon T. Alexander and Rachel E. Smith; and the School Defendants are represented by William F. Ellis, Esq.

# I. Constitutional and Statutory Framework.

## A. Vermont's Town Tuition Program.

Vermont's Constitution provides:

2

> That all persons have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, as in their opinion shall be regulated by the word of God; *and that no person ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience[.]*

Vt. Const. ch. I, art. 3 (emphasis supplied). The latter clause is commonly referred to as the "Compelled Support Clause."

The "Town Tuition Program" is a Vermont statutory program that provides tuition to students who live in towns without public schools so that they can obtain a publicly funded education. Under Vermont law,

(a) Each school district shall maintain one or more approved high schools in which high school education is provided for its resident students unless:

    (1) the electorate authorizes the school board to close an existing high school and to provide for the high school education of its students by paying tuition to a public high school, an approved independent high school, or an independent school meeting education quality standards, to be selected by the parents or guardians of the student, within or outside the State; or

    (2) the school district is organized to provide only elementary education for its students.

(b) For purposes of this section, a school district that is organized to provide kindergarten through grade 12 and maintains a program of education for only the first eight years of compulsory school attendance shall be obligated to pay tuition for its resident students for at least four additional years.

(c)(1) A school district may both maintain a high school and furnish high school education by paying tuition:

    (A) to a public school as in the judgment of the school board may best serve the interests of the students; or

    (B) to an approved independent school or an independent school meeting education quality standards if the school board judges that a student has unique educational needs that cannot be served within the district or at a nearby public school.

(2) The judgment of the [school] board shall be final in regard to the institution the students may attend at public cost.

16 V.S.A § 822.

**B.     The Role of the State Board of Education and School Boards.**

The Vermont State Board of Education ("SBE") hears appeals of tuition decisions made by each school district:

> A school district shall not pay the tuition of a student except to a public school, an approved independent school, an independent school meeting education quality standards, a tutorial program approved by the State Board, an approved education program, or an independent school in another state or country approved under the laws of that state or country, nor shall payment of tuition on behalf of a person be denied on account of age. Unless otherwise provided, a person who is aggrieved by a decision of a school board relating to eligibility for tuition payments, the amount of tuition payable, or the school he or she may attend, may appeal to the State Board and its decision shall be final.

16 V.S.A. § 828. The SBE also determines which schools are "approved independent schools":

> To become an approved independent school, the school must: (1) offer elementary or secondary education; (2) provide a prescribed minimum course of study; and (3) "substantially" comply with Vermont Board of Education rules for approved independent schools. 16 V.S.A. § 166(b). The rules must at a minimum require "that the school has the resources required to meet its stated objectives, including financial capacity, faculty who are qualified by training and experience in the areas in which they are assigned, and physical facilities and special services that are in accordance with any state or federal law or regulation." *Id.*

*Chittenden Town Sch. Dist. v. Dep't of Educ. (Chittenden Town)*, 738 A.2d 539, 545 (Vt. 1999) (footnote omitted).

**C.     *Chittenden Town*'s Requirement of "Adequate Safeguards."**

The Vermont Supreme Court has described the Town Tuition Program as "quite simple"; if a town school district "provides elementary education, it is required to provide secondary education." *Id.* at 544 (citing 16 V.S.A. § 822(a)). A town "has a number of options in meeting this obligation. The two main ones are to maintain a public high school or to pay tuition 'to an approved public or independent high school, to be selected by the parents or guardians of the pupil, within or without the state." *Id.* (footnote omitted) (quoting 16 V.S.A. § 822(a)-(b)).

"Neither the [Town Tuition Program] statute nor the rules deal with sectarian education[]" and "neither the statute nor the rules deal with the religious part of the curriculum of a sectarian school." *Id.* at 545. There is thus "no limit on the quantity and nature of sectarian subjects[,]" nor is there any requirement that "sectarian education be separated from secular education. It is [therefore] entirely possible that the majority of the education in an approved independent school will be in religious tenets and doctrine." *Id.* (footnote omitted). This lack of restraints on a publicly funded religious education prompted the Vermont Supreme Court to "consider the constitutional implications of the [Town Tuition Program] authorizing school districts to provide high school education to their students by paying tuition for nonpublic schools selected by their parents." *Id.* at 541 (citing 16 V.S.A. §§ 822, 824).

Having concluded in a prior case that "the Establishment Clause of the United States Constitution was not an impediment to the reimbursement at public expense of tuition paid to a sectarian school[,]" in *Chittenden Town*, the Vermont Supreme Court addressed "whether the tuition reimbursement scheme transgresses the Compelled Support Clause of the Vermont Constitution, Vt. Const. ch. I, art. 3, which speaks not to establishment of religion but to state support of religious worship." 738 A.2d at 541.

Holding "that a school district violates Chapter I, Article 3 [of Vermont's Constitution] when it reimburses tuition for a sectarian school under [16 V.S.A.] § 822 in the absence of adequate safeguards against the use of such funds for religious worship[,]" *id.* at 541-42, the court observed that "Article 3 is not offended . . . unless the compelled support is for the 'worship' itself." *Id.* at 550. As a result, the constitutional defect to be remedied in Vermont's Town Tuition Program is the absence of "restrictions that prevent the use of public money to fund religious education." *Id.* at 562 (observing the court saw "no way to separate religious instruction from religious worship").

To the extent that *Chittenden Town* may be misread as precluding all payments of public funds to religious schools, the Vermont Supreme Court specifically disavowed that interpretation:

5

Because we have concluded that Chittenden's tuition payments to religious schools violate Article 3, [the Compelled Support Clause,] we must address plaintiff's additional contention that such an outcome violates the Free Exercise Clause of the First Amendment. It plainly does not. *The Free Exercise argument is premised on plaintiff's assumption that we would conclude that children who attend religious schools may not receive public educational funding, while children who attend public schools may. This is not our ruling. We have determined only that public funds may not pay for religious worship within the meaning of Article 3, wherever it occurs.*

*Id.* at 563 (emphasis supplied).

### D.    "Adequate Safeguards" Remains Undefined.

The Vermont Supreme Court acknowledged that "adequate safeguards" and "appropriate restrictions[]" could render publicly funded tuition payments to religious schools constitutionally permissible. *Id.* at 542, 564. It has cautioned that *Chittenden Town* is a "narrow ruling" whose "most critical lesson . . . is that the fact that the recipient of government support is a religious organization is not itself determinative[;] . . . whether the funds are used to support religious worship is the critical question." *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 23, 205 Vt. 586, 597-98, 178 A.3d 313, 320 (observing that *Chittenden Town* does not prevent "children who attend religious schools" from "receiv[ing] public educational funding").

The Vermont Supreme Court has recognized that there are "myriad ways that a public school district can subsidize education in a religious school by paying for expenses that occur whether or not the school was sectarian." *Chittenden Town*, 738 A.2d at 562 (footnote omitted). It, however, has never described those ways. In response to a certified question as to how "adequate safeguards" should be defined or determined, the Vermont Supreme Court declined to answer, asserting that it requires a factual record which documents a school board's attempt to define that standard for itself. Because in this case the school boards did not attempt to do so, the Vermont Supreme Court declined to provide guidance as to how that task should be undertaken.

The AOE has similarly declined to provide guidance. On January 14, 2021, it promulgated nonmandatory "best practices" for school districts that pay tuition to

6

approved independent schools but has since rescinded them. As a result, there is presently
no definition of the term "adequate safeguards" as used in *Chittenden Town* and no
guidance as to how that determination should be made.

Because Plaintiffs assert no facial challenge to the Compelled Support Clause of
the Vermont Constitution, where possible, the court must harmonize the dictates of
Vermont and federal law. *See Planned Parenthood Ass'n of Kansas City, Mo., Inc. v.
Ashcroft*, 462 U.S. 476, 493 (1983) (holding that "[w]here fairly possible, courts should
construe a statute to avoid a danger of unconstitutionality"); *Causeway Med. Suite v.
Ieyoub*, 109 F.3d 1096, 1107 (5th Cir. 1997) (holding that when "consider[ing] the
constitutionality of state [laws]," the court should be "mindful of the principle that [it]
should avoid 'federal-court nullification of state law,'") (quoting *Leavitt v. Jane L.*, 518
U.S. 137, 145 (1996)). Federal law, however, remains the supreme law of the land. *See
Testa v. Katt*, 330 U.S. 386, 391 (1947) (holding that "the Constitution and the laws
passed pursuant to it are the supreme laws of the land").

## II.    The FAC's Allegations.

### A.    Rice Memorial High School.

The school districts in which the Plaintiffs reside either do not maintain a public
high school or provide residents with the option to choose to attend a different school and
are therefore permitted to participate in the Town Tuition Program. Rice Memorial High
School ("Rice") is a Catholic high school that is owned and operated by the Diocese of
Burlington. Plaintiffs allege that "[t]he Diocese exercises its religion by operating Rice"
and "ministering to [its] student[s.]" (Doc. 16 at 24, ¶¶ 215-16.) It teaches students "to
recognize and develop their gifts by inspiring them to love learning, to serve others, and
to seek God through Jesus Christ and his Church." *Id.* at 24, ¶ 214. Rice offers numerous
honors and advanced placement courses, foreign language and fine arts courses, and is
noted for its academic excellence and its athletic programs. It also "instructs students in
the teachings of the Catholic faith, especially through the school's religion classes." *Id.* at
26, ¶ 231. Tuition at Rice Memorial High School is currently $11,600 per year.

Plaintiffs allege that "[m]ore than one-third of Rice's students are not members of

the Catholic Church" and that "[m]any families choose to send their students to Rice even though those families are not Catholic or do not share Rice's religious beliefs." *Id.* at 26, ¶¶ 235, 237. The Diocese of Burlington provides financial support to Rice, including through collections at local parishes. Plaintiffs allege that "donations and contributions from the Diocese cover the expenses of Masses held at Rice, the school's religious worship events[,]" and that the total cost to maintain supplies for Rice's Chapel and its public Masses is approximately "$200-$300 per year." *Id.* at 27, ¶¶ 248-49. They maintain that "Rice's chaplains are not paid a salary from Rice[,]" that its "worship activities are not funded by student tuition[,]" and that "Defendants have never made inquiries to establish how the Diocese funds its religious worship activities at its schools, generally, or at Rice, specifically." (Doc. 16 at 27, ¶¶ 250-52.)

Rice is recognized by SBE and AOE as an approved independent school under 16 V.S.A. § 166. Plaintiffs contend that the School Defendants have denied their requests for tuition to attend Rice "solely because Rice Memorial High School is religious." *Id.* at 31 ¶ 284. They allege that some students from sending towns wish to attend Rice but are unable to do so because their school districts do not allow them to use publicly funded tuition at Rice. They assert that each student who cannot attend Rice for this reason is "a lost ministry opportunity for the Diocese" of Burlington, *id.* at 25, ¶ 222, and that Rice "could provide tuition assistance and other ministry opportunities to other students if students from sending towns could receive Town Tuition Program funds." *Id.* at 27, ¶ 246.

### B.    Plaintiffs' Tuition Reimbursement Requests.

A.H. and her parents James and Darlene Hester are residents of South Hero, Vermont, part of the school district governed by the South Hero Board of School Directors, which is part of the Grand Isle Supervisory Union. The Hesters are Catholic, and A.H. attends Rice "because of the academic challenge, supportive community, individual attention, and integration of faith and learning that Rice provides." *Id.* at 19, ¶ 136. On February 6, 2020, James Hester submitted a tuition request for A.H.'s tuition at Rice to David Mills, the Parent Liaison of the Grand Isle Supervisory Union. On

February 26, 2020, Mr. Mills emailed Mr. Hester notifying him that the school district
would deny their request for reimbursement because "Rice is a religious school for which
we do not pay tuition." *Id.* at 28, ¶ 258 (internal quotation marks omitted). The email also
contained a quote from a linked website which stated:

> Vermont's Town Tuitioning Program was launched in 1869, making it the
> oldest school choice program. The school voucher program provides
> educational options for students whose towns do not have public schools.
> The sending town pays school tuition directly to the "receiving" school,
> which can be any public or private, nonreligious school in or outside
> Vermont.

(Doc. 16 at 28, ¶ 259.)

On August 14, 2020, Mr. Hester again requested tuition reimbursement for A.H.'s
Rice tuition from Defendant Michael Clark, the Superintendent of the Grand Isle
Supervisory Union. On August 21, 2020, Defendant Clark emailed Mr. Hester and
informed him that the South Hero School Board had denied his request. The email
included the following excerpt from the school board's meeting minutes:

> B. Chutter said the board has received a request from Mr. and Mrs. Hester
> for the district to pay tuition to Rice Memorial High School. M. Clark said
> the district has communicated to the family that this is contradictory to the
> Vermont Constitution. He shared advice from lawyer Pietro Lynn that the
> district not pay tuition to a religious school. B. Chutter moved the board
> follow the advice of legal counsel and support the superintendent's denial
> of Jim and Darlene Hester's tuition reimbursement request for Rice
> Memorial High School. B. Vaughan seconded the motion. Approved
> unanimously on a voice vote.

*Id.* at 31, ¶ 282. The Hesters paid $10,860 for A.H. to attend Rice during the 2019-
2020 school year and $11,600 for the 2020-2021 school year.

E.R. and her parents Chad and Angela Ross live in Grand Isle, Vermont, part of
the school district governed by the CIUUSD Board of Directors which, in turn, is part of
the Grand Isle Supervisory Union. The Rosses are Catholic, and E.R. attends Rice
"because of the academic rigor, small class sizes, structure, discipline, and Catholic
formation." *Id.* at 20, ¶ 160. On August 12, 2020, the Rosses requested reimbursement
for E.R.'s tuition at Rice from the Grand Isle Supervisory Union. On August 18, 2020,

Mr. Mills responded to Mrs. Ross and stated: "I want to make sure you understand that we do not pay toward the tuition of Rice. The Vermont constitution bars public school tuition payments to religious schools. It is considered state support for religion." *Id.* at 31, ¶ 286 (internal quotation marks omitted). On August 24, 2020, the Rosses submitted their tuition request to Defendant Clark, and he responded similarly, stating that the district denied the request because "the Vermont Constitution bars public payments to religious institutions. It is considered state support for religion[]" *Id.* at 31, ¶ 288. He offered to forward the Rosses' tuition request to their school board.

At its September 1, 2020 meeting, the CIUUSD Board of Directors considered the Rosses' tuition request. Defendant Clark stated that he informed Angela Ross that it was not a town policy but rather the Vermont state constitution which barred such payments and provided the board members with a letter from Pietro Lynn, Esq., which explained his legal opinion supporting this outcome. Defendant Clark suggested that the board move to deny the request based on advice of legal counsel. The CIUUSD Board of Directors subsequently unanimously voted to deny the Rosses' tuition request without further discussion. The Rosses receive tuition assistance from Rice and pay $711 per month in order for E.R. to attend that high school.

A.F. and her parents Daniel and Juliane Foley live in Georgia, Vermont, part of the school district governed by the Georgia Board of School Directors, which is part of the Franklin West Supervisory Union. The Foleys are Catholic, and A.F. attends Rice "because a faith-based education is important to them." *Id.* at 22, ¶ 181. On October 19, 2020, Mrs. Foley wrote to the Georgia Board of School Directors requesting tuition reimbursement for A.F.'s tuition at Rice. That same day, Georgia Board of School Directors Chair Carl Laroe responded to Mrs. Foley and told her that he had forwarded her request to the school superintendent but added: "I will tell you and you may already know this but we have already denied another request such as yours." (Doc. 16 at 33, ¶ 307) (internal quotation marks omitted). Plaintiffs allege that this previous denial occurred on September 1, 2020, when the Georgia Board of School Directors met and considered a tuition reimbursement request for an unnamed student to attend Rice. The

parent of the student attended the meeting and stated that he was making the request in light of the U.S. Supreme Court's decision in *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020). Defendant James Tager, the Superintendent of the Franklin West Supervisory Union, stated that *Espinoza*'s effect on the Town Tuition Program "came up with" Defendant "French of the [AOE]," who said that "there will be talk about this, but no movement yet in the state of Vermont." (Doc. 16 at 33, ¶ 301) (internal quotation marks omitted). The board voted to deny the Foleys' tuition request.

On October 30, 2020, Randall Morton, the Business Manager for the Franklin West Supervisory Union, informed Juliane Foley that her tuition request was denied:

> Unfortunately at this time, we cannot pay for tuition to Rice High School. The recent Supreme Court decision clears the way for parochial school tuition payments so long as the state law doesn't prohibit them. The current state of the law in Vermont, applying our constitution (not federal law), is that public schools cannot pay tuition to parochial schools.

*Id.* at 34, ¶ 309. The Foleys paid $11,600 for A.F. to attend Rice during the 2020-2021 school year.

C.R. and her parents Gilles and Elke Rainville also live in Georgia, Vermont. C.R. attends Bellows Free Academy, a public school in St. Albans, Vermont. The Rainvilles are Catholic and wish to send C.R. to Rice because of its "smaller school environment" and because it provides "an education that is integrated with [their] Catholic faith" but cannot afford to do so without access to the Town Tuition Program. *Id.* at 24, ¶¶ 207-08. On October 19, 2020, the Rainvilles sent a tuition request to their school board, explaining that they were requesting a tuition reimbursement for C.R. to attend Rice beginning in January 2021. On October 20, 2020, Carl Laroe, Chair of the Georgia Board of School Directors, informed the Rainvilles that he had forwarded the request to Defendant Tager and stated that "the State of Vermont will end up in court over a bunch of these requests not being granted." *Id.* at 34, ¶ 313 (internal quotation marks omitted). After Mrs. Rainville followed up with Mr. Laroe on November 2, 2020, Mr. Laroe responded: "I know it's a no. I will send you the email that was sent to a few other

people[,]" and forwarded the email that Mr. Morton sent to the Foleys when denying their tuition request. *Id.* at 34, ¶ 315 (internal quotation marks omitted).

## C.   Alleged Guidance from Defendant French and the AOE.

Plaintiffs contend that "[Defendant] French and the [AOE] set policy and direct local school districts to exclude religious schools and their students from the Town Tuition Program[.]" *Id.* at 7-8, ¶ 50. They note that "although the [AOE] has stripped funding from school districts that paid tuition to religious schools, the Agency and [Defendant] French fully fund districts that discriminate against religious schools and their students." (Doc. 16 at 8, ¶ 51.) Plaintiffs further assert that, rather than adopt the "adequate safeguards" necessary under *Chittenden Town* to permit religious schools to participate in the Town Tuition Program, Defendant French and his employees have "repeatedly stated publicly that religious schools are ineligible for publicly funded tuition under Vermont law." *Id.* at 8, ¶ 53.

In 2010, AOE issued a white paper which stated that "[f]or towns without schools at grades 7-12 (which aren't members of a public school supervisory union), school boards pay tuition to public or approved independent schools that parents choose, within or outside Vermont, *not including religious schools*." *Id.* at 14, ¶ 100 (emphasis supplied). On December 27, 2010, Plaintiffs assert that an unnamed AOE official informed an unnamed Vermont school district official that, when participating in the Town Tuition Program, "parents and students may choose any approved public high school or approved independent school, *though not a religious school*." *Id.* at 15, ¶ 49 (emphasis supplied).

In 2012, AOE issued guidance which states that "**Title 16, Sec. 822** authorizes districts that don't operate high schools (grades 7-12) to pay tuition – for schools chosen by the parents – to other public high schools in Vermont or in other states, or to approved independent schools in Vermont (*not including religious schools*) or other states, if schools in other states are approved there." *Id.* at 15, ¶ 103 (second emphasis supplied).

On December 14, 2015, while Defendant French was a local school district superintendent, he wrote to the State of Vermont seeking guidance on a tuition request

from a parent who sent her child to a Vermont Episcopalian school. Defendant French stated that he employed a tripartite test to determine whether schools were "pervasively sectarian," which asked "1) is the school affiliated with a sect, 2) does the school require students to participate in sectarian activities, and 3) does the school require education in specific sectarian courses or other curriculum activities." *Id.* at 16, ¶ 109 (internal quotation marks omitted). On January 23, 2019, Defendant French allegedly wrote that "[i]n order to be an approved independent school, the school must be [] non-sectarian." (Doc. 16 at 16, ¶ 113) (internal quotation marks omitted) (second alteration in original).

## D. The Roles of Defendant French, the Superintendents, and the School Boards.

Under Vermont law, Defendant French's duties include "[s]upervis[ing] and direct[ing] the execution of the laws relating to the public schools and ensur[ing] compliance." 16 V.S.A. § 212(5). Plaintiffs allege that AOE has the authority to penalize local school districts that pay Town Tuition Program funds in a manner inconsistent with the AOE's interpretation of Vermont law and that the AOE has done so in the past.[1] They maintain that Defendant French and the AOE have failed to intervene, correct, or strip funding from school districts that exclude students at religious schools from the Town Tuition Program.

Plaintiffs assert that Defendants Clark and Tager, as superintendents of their respective supervisory unions and chief executive officers of their member school districts, "implement[] the policies of the" schools boards that are members of the supervisory unions, (Doc. 16 at 6-7, ¶¶ 39, 47), but admit that each school board "bears the legal burden of furnishing a publicly funded education" to its resident children. *Id.* at 6, 7, ¶¶ 33, 37, 43.

___

[1] Plaintiffs cite to a single instance in 1996 in which the Chittenden Town school district authorized Town Tuition payments for resident students who attended Mount Saint Joseph Academy, a Catholic school. The Vermont Department of Education, which has since been renamed the AOE, revoked the school district's state aid, an action which prompted the Vermont Supreme Court's *Chittenden Town* decision.

## III.    Conclusions of Law and Analysis.

Defendant French argues that Plaintiffs lack standing to sue him because they fail to allege causation or redressability and because he is protected by sovereign immunity. He also asserts that the Diocese of Burlington lacks standing to raise the rights of its potential students.

### A.    Standard of Review.

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (internal quotation marks and citation omitted). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Id.* "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).

### B.    Whether Plaintiffs Have Standing to Sue Defendant French.

"Standing is a federal jurisdictional question 'determining the power of the court to entertain the suit.'" *Carver v. City of N.Y.*, 621 F.3d 221, 225 (2d Cir. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[.] Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (internal quotation marks, citations, alterations, and footnote omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements[.]" *Id.* at 561 (internal citation omitted).

Defendant French does not dispute that Plaintiffs have plausibly pled an injury in fact, but contends that Plaintiffs do not have standing because they have failed to allege either causation or redressability insofar as it pertains to his role in denying Plaintiffs' tuition requests. In support of this contention, he relies on the Vermont Supreme Court's explanation of which entity decides tuition requests under the Town Tuition Program:

> Although the relevant statutes allow school districts to pay tuition on behalf of a resident who is a student in any approved private school, the *districts* must determine whether such a payment violates the Establishment Clause. *This responsibility rests upon them*, and not the State Board, except as a matter of appellate review.

*Campbell v. Manchester Bd. of Sch. Dirs.*, 641 A.2d 352, 356 (Vt. 1994) (emphasis supplied). Plaintiffs nonetheless maintain that Defendant French's acts or omissions were a proximate cause of their injuries because he and the AOE have "directed and encouraged local school districts to exclude religious schools and their students." (Doc. 16 at 17, ¶ 121.) At this juncture, the court must accept Plaintiffs' non-conclusory factual allegations as true.

"[T]he 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party[.]" *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). "[I]ndirectness of injury, while not necessarily fatal to standing, may make it substantially more difficult to meet the minimum requirement of Art. III: To establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id.* at 44-45 (internal quotation marks omitted). This is because the Supreme Court has "refus[ed] to endorse standing theories that rest on speculation about the decisions of independent actors[.]" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (internal quotation marks and citation omitted).

However, "[w]hile . . . it does not suffice if the injury complained of is the result
of the *independent* action of some third party not before the court, that does not exclude
injury produced by determinative or coercive effect upon the action of someone else."
*Bennett v. Spear*, 520 U.S. 154, 169 (1997) (internal quotation marks, alterations, and
citations omitted) (emphasis in original); *see also Carter v. HealthPort Techs., LLC*, 822
F.3d 47, 55-56 (2d Cir. 2016) (holding that "[a] defendant's conduct that injures a
plaintiff but does so only indirectly, after intervening conduct by another person, may
suffice for Article III standing"). At the pleading stage, this is not "an onerous
standard[,]" *id.* at 55, and is a "relatively modest" burden to meet. *Bennett*, 520 U.S. at
171.

Where, as here, "a plaintiff's asserted injury arises from the government's
allegedly unlawful regulation (or lack of regulation) of *someone else*, . . . causation and
redressability ordinarily hinge on the response of the regulated (or regulable) third party
to the government action or inaction[,]" and it is "the burden of the plaintiff to adduce
facts showing that [the choices of the third party] have been or will be made in such
manner as to produce causation and permit redressability of injury[.]" *Lujan*, 504 U.S. at
562 (internal quotation marks and citations omitted). However, "[a]t the pleading stage,
general factual allegations of injury resulting from the defendant's conduct may suffice"
because "on a motion to dismiss we presume that general allegations embrace those
specific facts that are necessary to support the claim." *Id.* at 561 (internal quotation
marks, citation, and alteration omitted).

Plaintiffs contend that Defendant French has caused their injuries because
"Vermont statute specifically tasks [him] with supervising and directing 'the execution of
laws relating to the public schools' and ensuring compliance with those laws[,]" (Doc. 38
at 17), and Defendant French has not "stripped funding from districts that
unconstitutionally exclude religious schools and their students from the Town Tuition
Program." (Doc. 16 at 9, ¶ 57.) To the extent that Plaintiffs argue that they have standing
because Defendant French is generally responsible for Vermont's education programs
and has neglected to deny funding to school districts who have refused Plaintiffs' tuition

16

requests, their claim must fail. Defendant French's general authority over Vermont's education programs is insufficient, without more, to establish traceability. *See Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (holding that "[i]n the absence of any evidence that the Secretary controls ballot order, the voters and organizations likewise cannot rely on the Secretary's general election authority to establish traceability"); *see also Lewis v. Governor of Alabama*, 944 F.3d 1287, 1300 (11th Cir. 2019) (holding that a statute that "generally authorizes the Attorney General" to institute and prosecute civil actions was not "sufficient to confer standing to sue the Attorney General"); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015) (holding that "[g]eneral authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law") (quoting *1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108, 113 (3rd Cir. 1993)).

Plaintiffs further assert that Defendant French and "his agents and employees have repeatedly stated publicly that religious schools are ineligible for publicly funded tuition under Vermont law. They have also advised school districts that tuition payments cannot be made to religious schools." (Doc. 16 at 8, ¶ 53.) In several instances, AOE officials, including Defendant French, have opined that public funds are not available to fund tuition at "sectarian" schools. Although, as Defendant French points out, many of these instances occurred prior to the Supreme Court's decision in *Espinoza*, Plaintiffs' theory of standing is more than mere speculation because it "relies . . . on the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 139 S. Ct. at 2566; *see also Dennis v. JP Morgan Chase & Co.*, 343 F. Supp. 3d 122, 156 (S.D.N.Y. 2018) (observing that "the standard for Article III standing is not whether [] the alleged injury is *plausibly* fairly traceable, but, rather, whether the injury is *possibly* fairly traceable") (emphasis in original). Defendant French and the AOE have not disavowed their prior guidance nor promulgated new guidance since *Espinoza*. Plaintiffs' allegations that several Vermont school boards and their legal advisors have interpreted AOE's position as forbidding reimbursement for tuition at any religious school is thus sufficient to assert that Defendant French and the AOE's guidance has had a determinative effect.

Defendant French's argument that each school board's records indicate that they voted to deny Plaintiffs' requests on either the advice of their legal counsel or the advice of their superintendents does not alter that conclusion. The court does not weigh the evidence or decide the merits of a claim on a motion to dismiss. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017) (holding that, at the pleading stage, the court does not "weigh the evidence" nor "evaluate the likelihood" that a plaintiff's claims will prevail).

     "Defendants may certainly test [Plaintiffs'] standing as the litigation progresses by requesting an evidentiary hearing or by challenging [Plaintiffs'] standing on summary judgment or even at trial[,]" *Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003), however, at the pleading stage, "[t]o the degree that defendants challenge the factual underpinnings of the allegations made by plaintiffs in support of their standing to bring suit, the argument is premature." *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 361 (2d Cir. 2003).

     Finally, Defendant French points to this court's finding in *A.M. v. French* that, since 2001, at least twenty-two different independent secondary schools that have an apparent or declared religious affiliation located both within and outside of Vermont have received public tuition funds from at least thirty-three separate Vermont school districts. These school districts have suffered no adverse consequences for violating Defendant French's alleged policy and he has "never withheld, or indicated [he] would withhold, a district's funding because it paid tuition to a religious school." *Valente v. French*, No. 5:20-cv-00135 (D. Vt. Oct. 16, 2020) (Doc. 43-1 at 3, ¶ 7); *see also Nat'l Council of La Raza v. Mukasey*, 283 F. App'x 848, 852 (2d Cir. 2008) (finding no coercive effect where several "state and local authorities choose not to comply with" the Department of Homeland Security's requests to arrest persons violating immigration laws and "plaintiffs do not allege that such authorities suffer any adverse consequences from this resistance"). Although Defendant French's alleged actions may not have had a coercive effect, because Plaintiffs have plausibly pled that Defendant French and the AOE's actions had a *determinative* effect on the School Defendants' denial of their tuition requests at Rice, the

FAC, taken as true, plausibly alleges that Defendant French had a causal relationship to Plaintiffs' injuries, and his motion to dismiss for lack of standing must be DENIED.

### C.     Whether the Diocese of Burlington has Standing to Raise the Rights of Third Parties.

In the FAC, the Diocese of Burlington asserts claims on its own behalf and "on behalf of families who both are eligible to receive town tuition benefits from Defendants and who wish to attend Rice but cannot without the public benefit that is accorded other private schools." (Doc. 16 at 4, ¶ 14.) "[A] party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). The Supreme Court has "recogniz[ed] that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another" but has "requir[ed] that a party seeking third-party standing make two additional showings": (1) that "the party asserting the right has a 'close' relationship with the person who possesses the right" and (2) that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 129-30 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

"Within the context of the First Amendment," the Supreme Court has held that "a lessening of prudential limitations on standing" is justified where "there is a possibility that, rather than risk punishment for his conduct in challenging the [state's action], [the third party] will refrain from engaging further in the protected activity." *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984). In other words, courts may find standing to assert the rights of a third party where the "third party is understandably reluctant to engage in the allegedly protected activity for fear of prosecution or other penalty." *Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344, 352 (1st Cir. 2004) (footnote omitted). At times, the Supreme Court has extended third-party standing to schools that have asserted the rights of their students. *See, e.g., Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 536 (1925) (recognizing standing of religious schools to assert the rights of potential pupils who might seek to

attend them because "[t]heir interest is clear and immediate . . . to protect business enterprises against interference with the freedom of patrons or customers"); *Runyon v. McCrary*, 427 U.S. 160, 175 n.13 (1976) ("It is clear that the schools have standing to assert these arguments on behalf of their patrons.").

In this case, however, there is no threat of "criminal or civil penalty for any action that might be taken by" Rice's potential pupils or their parents and therefore no reason that they are "generically unable to assert [their] rights or that the circumstances of this case create some idiosyncratic barrier to such a suit." *Eulitt*, 386 F.3d at 352. Indeed, the Rainvilles, who allege that they would send their daughter to Rice if they could use Town Tuition funds to do so, are the type of party whose rights the Diocese of Burlington seeks to assert. *See Hodak v. City of St. Peters*, 535 F.3d 899, 905 (8th Cir. 2008) (holding that "if a third party actually asserts his own rights, no hindrance exists, and third-party standing is improper"); *Philadelphia Marine Trade Ass'n-Int'l Longshoremen's Ass'n Pension Fund v. Comm'r*, 523 F.3d 140, 145 (3d Cir. 2008) (finding no third-party standing where "the [third party] is not only willing to sue on its own behalf – it *has* sued") (emphasis in original); *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994) (holding that "the very participation of the [third parties] in this suit demonstrates that there is no hindrance to the [third parties'] ability to protect their own interests").

Because the Diocese of Burlington lacks standing to assert the claims of third parties not before the court, its third-party claims are DISMISSED.

### D.     Whether Defendant French is Protected by Sovereign Immunity.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The Supreme Court has consistently held that the federal courts lack jurisdiction not only over suits against a state brought by citizens of other states, as the literal language of the Amendment provides, but also over suits against such states brought by their own citizens." *Dwyer v. Regan*, 777 F.2d 825,

835 (2d Cir. 1985). "An action against a state official in his official capacity is deemed an action against the state itself, which possesses sovereign immunity under the Eleventh Amendment[.]" *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020) (internal citations omitted).

"The Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). This is because "the officer is simply prohibited from doing an act which he had no legal right to do." *Ex Parte Young*, 209 U.S. 123, 159 (1908). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)); *see also In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (holding that "[a] plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that his complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective") (internal quotation marks and citation omitted).

Defendant French contends that the *Ex Parte Young* exception does not apply because "th[e] exception under *Ex parte Young* only applies where the official sued has 'some connection with the enforcement of the [allegedly unconstitutional act].'" *Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 68 (E.D.N.Y. 2018) (quoting *Kuck v. Danaher*, 822 F. Supp. 2d 109, 141 (D. Conn. 2011)) (second alteration in original) (footnotes omitted). A state official's general duty to enforce state laws is insufficient to establish the requisite connection.[2]

---

[2] *See Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 69 (E.D.N.Y. 2018) (observing that "courts in the Second Circuit have not extended the exception under *Ex parte Young* on the basis that a state official has a general duty to execute and enforce state

Plaintiffs allege that Defendant French has specifically advised and directed School Defendants to deny tuition requests for children to attend religious schools and they seek injunctive relief prohibiting Defendant French from continuing to do so.[3] These factual allegations, accepted as true, are sufficient to allege "some connection with the enforcement" of the policy beyond Defendant French's general duty to enforce state law. *Ex Parte Young*, 209 U.S. at 157. Defendant French's motion to dismiss on the grounds of Eleventh Amendment sovereign immunity is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Defendant French's motion to dismiss (Doc. 23.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 16th day of August, 2021.

Christina Reiss, District Judge
United States District Court

---

laws") (internal quotation marks and citations omitted); *see also McCluskey v. Comm'r of Nassau Cnty. Dep't of Soc. Servs.*, 2013 WL 4780954, at *8 (E.D.N.Y. Sept. 5, 2013) (holding that "[w]hile plaintiff has stated that the [state official] is responsible for the overall operation of [the state agency], this allegation, standing alone, is insufficient to demonstrate that the [state official] had a direct connection to, or responsibility for, the alleged illegal action") (internal quotation marks, alteration, and citation omitted).

[3] Defendant French has not requested dismissal of Plaintiffs' requests for monetary relief.